## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| **LAWRENCE R. MERENDA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:10-CV-493 (MTT)** |
| | ) | |
| **JUSTIN J. TABOR,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

This matter is before the Court on the Defendant's Motion for Summary

Judgment. (Doc. 24). The Court heard oral argument on March 20, 2012. For the

following reasons, the Motion is **DENIED in part and GRANTED in part**.

## I.  FACTUAL BACKGROUND

This action arises out of the arrest of Plaintiff Lawrence Merenda on December

24, 2008, by Defendant Justin Tabor, who was then a trooper with the Georgia State

Patrol. The Plaintiff's daughter, Laurie, was pulled over by the Defendant in the parking

lot of the nursing home where the Plaintiff works. While the Defendant sat in his patrol

car writing a ticket for Laurie for wearing her seatbelt under her arm, Laurie called the

Plaintiff. The Plaintiff, who was "minutes away from leaving for the holidays," went

outside to investigate. (Doc. 24-6, Deposition of Lawrence Merenda, at 14).

The Plaintiff first walked to Laurie's car and they briefly spoke about what had

happened. The Plaintiff then walked to the Defendant's patrol car to speak with him.

The Plaintiff leaned slightly into the open driver's window and asked the Defendant not

to write Laurie a ticket because he viewed wearing a seatbelt under one's arm as a minor infraction and because Laurie was having financial problems.  The Defendant said he would not excuse her infraction and went on to say, "Well, you being a parent, you should understand.  Having a seatbelt on that way, she won't get thrown out of the car, but if you're okay with having her head smashing against the steering wheel, as a parent, that's up to you."  (Doc. 24-5, Tabor audio/video recording 13:21:55 – 13:22:08)  The Plaintiff said "this sucks," and, as he was turning to walk toward the nursing home in the direction of Laurie's car, said, according to the Defendant, "you're a f***ing asshole" or, according to the Plaintiff, "f***ing asshole."  In any event, it is clear that the Plaintiff was referring to the Defendant.  It is undisputed that the Plaintiff was turning away as he uttered the words.  (Doc. 24-6, Deposition of Lawrence Merenda, at 23-24); (Doc. 24-4, Deposition of Justin Tabor, at 45-47).  Although most of the Plaintiff's conversation with the Defendant can be heard clearly on the patrol car's audio/video recorder, his epithet cannot, either because he spoke softly or because he had turned away from the microphones, or both.[1]  No one was in the vicinity and only the Defendant heard what the Plaintiff said.

As the Plaintiff swiftly walked toward the nursing home, the Defendant, from his patrol car, twice said "come here."  The Plaintiff continued on his path, and the Defendant got out of his patrol car to catch up with him.  In his "revised" incident report, the Defendant stated that at that point he only intended to detain the Plaintiff until he calmed down.  (Doc. 24-4, at 55).  However, the Defendant testified in his deposition that the decision to arrest the Plaintiff already had been made.  (Doc. 24-4, Deposition

---

[1] The Court could not hear what was said, but the Court's law clerk could.  The point, however, is that the offensive language was not spoken loudly.

of Justin Tabor, at 34).  That is, he intended to arrest the Plaintiff because of what he said.

After he got out of the patrol car, the Defendant said "sir," and the Plaintiff immediately turned around.[2]  When the Defendant reached the Plaintiff, he told him to place his hands behind his back,[3] but the Plaintiff repeatedly asked why.  The Plaintiff again was asked to place his hands behind his back, and the Plaintiff shouted, "Would you let me?" and "They're back there."[4]   (Doc. 24-5, Tabor audio/video recording 13:22:50 – 59).  The Defendant placed the Plaintiff in a choke hold and bent him over the trunk of a car.  In his revised incident report, the Defendant claimed the Plaintiff was moving his arms and hands in a threatening manner.  (Doc. 24-4, at 55).  The Defendant testified in his deposition, however, that he did not remember what threatening movements the Plaintiff had made, but the Plaintiff's arms were by his side and his elbows were locked, which he said could be considered threatening.  (Doc. 24-4, Deposition of Justin Tabor, at 80-82).  The Plaintiff admits he was stiff, but argues it was because the Defendant had pinned him between the trunk.  The Plaintiff was handcuffed and placed into the back of the Defendant's patrol car.

The Plaintiff asked the Defendant to loosen the handcuffs, but the Defendant refused.  The Plaintiff again asked the Defendant to loosen the handcuffs while the

---

[2] The Defendant claims the Plaintiff turned around, pointed his finger, and said "f*** you."  (Doc. 24-4, Deposition of Justin Tabor at 69-70).  Although the Plaintiff says he "might have" pointed at the Defendant when the Defendant was coming toward him, there is no evidence he pointed at the Defendant on the audio/video recording.  (Doc. 24-6, Deposition of Lawrence Merenda, at 48).  The Plaintiff denies saying "f*** you" as the Defendant approached him, and these words cannot be heard on the audio/video recording.

[3] After the Defendant's command, the Parties moved out of the frame of the audio/video recorder.

[4] The audio feed briefly went out between these two statements.

Defendant was requesting backup on the police radio.  The Plaintiff asked a third time and the Defendant told the Plaintiff to wait.  The Defendant told the Plaintiff what he did was foolish and said, "Larry, you can't talk to people like that.  Especially not the police, and get away with it."  (Doc. 24-5, Tabor audio/video recording 13:26:53 – 59).

Once Sergeant Keith Collins, the Defendant's then-supervisor, arrived on the scene, the Defendant walked to Laurie's car and explained that she was receiving a $15 ticket for improperly wearing her seatbelt.  When Laurie asked what had happened with her dad, the Defendant said, "Well basically he said it was bulls***, and f*** you, and f*** that, and walked away.  I told him to come here, he said f*** you I ain't doing anything.  And that was that.  You can't do that."  (Doc. 24-5, Tabor audio/video recording 13:28:15 – 24).

The Defendant then explained what had happened to Collins.  The Defendant told Collins that he placed the Plaintiff against the trunk, and the Plaintiff then said "f*** you" when asked to place his hands behind his back.  (Doc. 24-5, Tabor audio/video recording 13:29:17 – 26).  The Defendant went on to say "I wrestled with him for just a second, choked him…. I don't think we damaged the car, but I'mma look at it."  (Doc. 24-5, Tabor audio/video recording 13:29: 26 – 35).

Collins spoke with the Plaintiff's coworkers who witnessed the use of force while the Defendant resumed his conversation with Laurie.  The Defendant told Laurie the Plaintiff would be charged with felony obstruction.  The Defendant then walked back to his patrol car and told the Plaintiff to get out so he could loosen the handcuffs.  The Plaintiff complained the handcuffs were still too tight and the Defendant loosened them

more.  The Defendant took the Plaintiff to Houston County Jail, and he was released around 5:00 pm on Christmas Day.

Lieutenant Kim Pittman reviewed the Defendant's initial incident report and asked the Defendant to supplement it because "Tabor's account of his actions and the reasons for the arrest of the violator were vague and lacking detail."  (Doc. 24-4, at 57).  The initial incident report no longer exists.  According to Special Investigations Director Angie Holt, "before an incident report is finalized and approved by a supervisor, changes to the report are made in the computer and copies of prior, unapproved versions are generally not retained."  (Doc. 30-1, Affidavit of Angie Holt, at ¶ 11).

It was in his revised incident report that the Defendant gave an account of events that suggested the arrest was not based on the Plaintiff's use of profanity.  However, as noted, the Defendant's deposition testimony makes clear that he based his decision to arrest on the Plaintiff's use of profanity.  For example, when asked whether he disagreed with the Georgia State Patrol's ultimate conclusion that the Plaintiff's "use of profanity in your presence does not justify his arrest," the Defendant testified that he disagreed with that conclusion because the GSP "was confused as to who all was in my presence."  (Doc. 24-4, Deposition of Justin Tabor, at 93).  "I arrested him because he used profanity not just only in my presence but everyone else's presence." *Id.* However, as the videotape clearly reveals, no one was close enough to have overheard the Plaintiff's comments.

Approximately one week after the Plaintiff's arrest, his nephew, a law enforcement patrol officer in Florida, contacted the Defendant to discuss the events. The Plaintiff's nephew questioned whether someone could be arrested for using

profanity toward a law enforcement officer, and the Defendant allegedly responded, "If I let him get away with cussing at me, everyone will think it's okay to cuss at me."  (Doc. 5-1, Declaration of Thomas Merenda, at ¶ 8).

By the time of his release from jail on December 25, 2008, the felony obstruction charge had been reduced to misdemeanor obstruction.  After the GSP concluded that the Defendant "had no legal cause to charge Mr. Merenda with Obstruction or Hindering a law enforcement officer," the GSP instructed the Defendant to contact the Houston County Solicitor's Office and arrange for the charge to be dismissed.  (Doc. 24-4, at 59); (Doc. 30-1, at 7).  Initially, the Assistant Solicitor told the Defendant that the charges would not be dismissed.  The GSP then instructed a sergeant to take a copy of the videotape to the Solicitor's Office.  After the Solicitor viewed the videotape, he agreed to nolle prosse the charge against the Plaintiff.

The Plaintiff brings this 42 U.S.C. § 1983 action for violations of his First and Fourth Amendment rights arising out of his arrest.  The Plaintiff also brings an Eighth Amendment excessive force claim for injuries he allegedly sustained from being handcuffed.  Specifically, he claims he developed carpal tunnel syndrome as a result of being handcuffed.

The Defendant moved for summary judgment on all three claims.

## II.  DISCUSSION

### A.  Motion for Summary Judgment Standard

Summary judgment must be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(c).  "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  The burden rests with the moving party to prove that no genuine issue of material fact exists.  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d at 1224.  The district court must "view all evidence in the light most favorable to the nonmoving party, and resolve all reasonable doubts about the facts in its favor."  *Id.*

### B. Fourth Amendment Claim

#### 1. Could the Plaintiff Be Arrested for His Speech?

The Plaintiff argues his arrest violated the Fourth Amendment because he was exercising his First Amendment rights when he said "f***ing asshole."  The Defendant argues he is entitled to qualified immunity because he had arguable probable cause to make a warrantless arrest for misdemeanor obstruction pursuant to O.C.G.A. § 16-10-24(a) and disorderly conduct pursuant to O.C.G.A. § 16-11-39(a)(3).[5]

"Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "There can be no doubt" that deputies effectuating an arrest are performing discretionary duties.  *Lee v. Ferraro*, 284 F.3d

---

[5] The Defendant also claimed that the Plaintiff could have been arrested pursuant to two Perry, Georgia ordinances without further argument.  One of those ordinances criminalizes the use of profanity in the presence of a woman.  The Court understands why the Defendant did not pursue that argument.

1188, 1194 (11th Cir. 2002).  "'Once discretionary authority is established, the burden

then shifts to the plaintiff to show that qualified immunity should not apply.'"  *Edwards v.*

*Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of West Palm*

*Beach,* 561 F.3d 1288, 1291 (11th Cir. 2009)).  To evaluate claims of qualified

immunity, the Court must determine "whether the officer's conduct amounted to a

constitutional violation" and "whether the right violated was 'clearly established' at the

time of the violation."  *City of West Palm Beach*, 561 F.3d at 1291.  The clearly

established law must provide a defendant with "fair warning" that his or her conduct

deprived the plaintiff of a constitutional right.  *Hope v. Pelzer*, 536 U.S. 730, 739-41

(2002).  This two-step analysis may be done in whatever order is deemed most

appropriate for the case.  *City of West Palm Beach*, 561 F.3d at 1291 (citing *Pearson v.*

*Callahan*, 555 U.S. 223 (2009)).

     The traditional two-step qualified immunity analysis is somewhat different in a

Fourth Amendment unlawful arrest action.  Although it is well established "that an arrest

without probable cause to believe a crime has been committed violates the Fourth

Amendment,"[6] an unlawful arrest plaintiff in the Eleventh Circuit must do more than

establish the absence of probable cause; he or she must establish the absence of

"arguable probable cause."  Specifically, "the inquiry is not whether probable cause

actually existed, but instead whether an officer reasonably could have believed that

probable cause existed in light of the information the officer possessed."  *Montoute v.*

*Carr*, 114 F.3d 181, 184 (11th Cir. 1997).  Further, in the Eleventh Circuit, if there is

arguable probable cause for an arrest, the officer is entitled to qualified immunity not

---

[6] *Madiwale v. Savaiko,* 117 F.3d 1321, 1324 (11th Cir. 1997).

only on a Fourth Amendment claim, but also on a First Amendment claim arising from the same facts. *Redd v. City of Enterprise*, 140 F.3d 1378, 1383-84 (11th Cir. 1988).[7]

There is some confusion with regard to where the arguable probable cause determination fits in the qualified immunity analysis. Some courts make the arguable probable cause determination as a part of the constitutional violation prong. *Skop v. City of Atlanta,* 485 F.3d 1130, 1137-43 (11th Cir. 2007). Other courts insist that the determination of arguable probable cause is a part of the clearly established law prong. *Poulakis v. Rogers*, 341 Fed. Appx. 523, 526-28 (11th Cir. 2009).[8] Most courts, however, do not bother to say where the arguable probable cause determination goes. *Coffin v. Brandau*, 642 F.3d 999, 1006-07 (11th Cir. 2011) (*en banc*).

There is some logic to the last approach because, at least in the Eleventh Circuit, the arguable probable cause determination, as a practical matter, subsumes the entire qualified immunity analysis. If there is no arguable probable cause, the plaintiff necessarily will have carried the burden of proving constitutional injury. To the extent the determination of arguable probable cause is based on relevant law demonstrating "whether an officer reasonably could have believed that probable cause existed," that determination will reveal whether the law was sufficiently established to provide "fair warning" to the officer that his or her conduct was unlawful. In short, the arguable

---

[7] In *Howards v. McLaughlin*, 634 F.3d 1131, 1148 (10th Cir. 2011) *cert. granted Reichle v. Howards*, __ U.S. __, 132 S. Ct. 815 (2011), the Tenth Circuit held that "it was clearly established that an arrest made in retaliation of an individual's First Amendment rights is unlawful, even if the arrest is supported by probable cause." *Howards* recognized that in the Second, Third, Fifth, Eighth, and Eleventh Circuits, plaintiffs are required to show an absence of arguable probable cause to prevail on their First Amendment retaliation claim. The Supreme Court recently heard oral arguments in that case.

[8] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

probable cause determination effectively reduces qualified immunity to a one-step analysis.[9]

However, the Eleventh Circuit's decision in *Poulakis* illustrates a possible reason why it could make a difference where the arguable probable cause determination is placed.  In *Poulakis*, the plaintiff complained that officers violated his Fourth Amendment rights when they arrested him for carrying an unlawfully concealed firearm.  Poulakis had stored his firearm in the closed center console of his automobile.  Unsure whether the firearm had been concealed in violation of Florida law, officers telephoned an Assistant State Attorney who, after hearing the facts, opined that the officers had probable cause to make an arrest.  As it turned out, however, Florida's concealed firearm statute excludes a firearm "securely encased" in a private vehicle.  Fla. Stat. § 790.25(5).  Consequently, the criminal charges were dropped.

Poulakis then filed a section 1983 civil rights action against the officers.  When the defendants moved for summary judgment based on qualified immunity, the dispositive issue was whether the officers had arguable probable cause to arrest Poulakis.  The panel majority made clear that the resolution of this question was a part of the clearly established law prong.  As the Court put it, "[i]n wrongful arrest cases, we have frequently framed the 'clearly established' prong as an 'arguable probable cause' inquiry.  In other words, we have said that when an officer violates the Constitution because he lacked [actual] probable cause to make an arrest, the officer's conduct may still be insulated under the second prong of qualified immunity *if* he had 'arguable

---

[9] At least this appears to be the case in the Eleventh Circuit.  In *Walczyk v. Rio*, 496 F.3d 139, 165-71 (2d Cir. 2007), Justice, then Judge, Sotomayor argued in a concurring opinion that the Second Circuit's articulation of the arguable probable cause test adds a third layer to the qualified immunity analysis.

probable cause' to make the arrest." *Poulakis*, 341 Fed. Appx. at 526 (emphasis in original).  Finding no Supreme Court, Eleventh Circuit, or Florida Supreme Court authority clearly establishing that a firearm in a console constituted a securely encased weapon, the majority held that the officers had arguable probable cause to arrest Poulakis.

The dissent took issue "with the majority's analysis [because] it treats arguable probable cause as part of the clearly established prong of the qualified immunity analysis, when both Eleventh Circuit precedent and reason show that whether a federal constitutional right was clearly established is distinct from whether a police officer was objectively reasonable in making an arrest." *Id.* at 534 (Quist, J., sitting by designation, dissenting).  To the dissent, the peculiar facts of the case made this a critical issue.  The dissent agreed that for purposes of resolving the clearly established law prong of qualified immunity analysis, the relevant authority was decisions of the Supreme Court, the Eleventh Circuit, and the Florida Supreme Court, and no decision of those courts had addressed the issue of whether a pistol in a console was securely encased pursuant to Florida's concealed weapon statute.  However, there was, the dissent noted, ample lower and intermediate court authority in Florida establishing that a firearm in a console was securely encased.  For purposes of the constitutional violation prong, a court can, the dissent continued, look to all applicable authority, not just the authority relevant to determine whether a right has been clearly established.

Thus, in this very narrow context, perhaps it could make a difference where the arguable probable cause determination fits in the qualified immunity analysis.  Here, however, as discussed below, whether the Defendant had arguable probable cause to

arrest the Plaintiff determines the fate of the Motion regardless of where that determination fits.

The Defendant claims two Georgia criminal statutes are relevant to the determination of whether he had arguable probable cause to arrest the Plaintiff.  First, the Defendant claims he had arguable probable cause to arrest the Plaintiff for misdemeanor obstruction, which is the offense of which the Plaintiff was eventually charged.  A person commits a misdemeanor when he "knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties." O.C.G.A. § 16-10-24(a).[10]  Second, the Defendant now claims he had arguable probable cause to arrest the Plaintiff for disorderly conduct, even though he did not charge the Plaintiff with this offense.[11]  One can be charged with disorderly conduct when one "[w]ithout provocation, uses to or of another person in such other person's presence, opprobrious or abusive words which by their very utterance tend to incite to an immediate breach of the peace, that is to say, words which as a matter of common knowledge and under ordinary circumstances will, when used to or of another person in such other person's presence, naturally tend to provoke violent resentment, that is, words commonly called 'fighting words.'"  O.C.G.A. § 16-11-39(a)(3).

---

[10] As mentioned, the charge against the Plaintiff was reduced from felony obstruction to misdemeanor obstruction.  Obstruction of a law enforcement officer which includes as an element "offering or doing violence" is a felony offense.  O.C.G.A. § 16-10-24(b).

[11] The "closely related offense doctrine" or "related offense doctrine"  allows an officer to assert actual or arguable probable cause existed to arrest for an uncharged offense so long as the uncharged offense involves the same conduct for which the suspect was arrested.  *Vance v. Nunnery*, 137 F.3d 270, 275 (5th Cir. 1998).  The Supreme Court, in *Devenpeck v. Alford,* 543 U.S. 146 (2004), held the charged and uncharged offenses need not be closely related, but the opinion offers little guidance on how related the offenses must be.  Here, the argument that the Defendant had arguable probable cause to arrest for disorderly conduct arises from the same facts that were the basis for the obstruction charge.  Thus, it is clear that the two offenses are sufficiently related.

Although these Georgia criminal statutes provide some context, the dispositive issues in this case are governed by the First Amendment. "The freedom of individuals verbally to oppose or challenge police action *without thereby risking arrest* is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462-63 (1987) (emphasis added). In *Lewis v. City of New Orleans*, 415 U.S. 130 (1974), the Supreme Court struck down an ordinance that made it "unlawful and a breach of the peace for any person wantonly to curse or revile or to use obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty" because the ordinance was not limited to "fighting words." Similarly, in *Hill*, the majority struck down a police obstruction ordinance for overbreadth. The *Hill* majority approvingly cited Justice Powell's concurrence in *City of New Orleans* in which he opined that the "fighting words doctrine" "might require a narrower application in cases involving words addressed to a police officer, because 'a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words.'" 482 U.S. at 462 (quoting *City of New Orleans*, 415 U.S. at 135 (Powell, J., concurring)).

To prove there was no arguable probable cause to arrest for misdemeanor obstruction or disorderly conduct for his speech, the Plaintiff primarily relies upon *Hill* and cases interpreting *Hill*. The Defendant did not address *Hill* in his briefs.[12] Instead, the Defendant first cites Georgia Court of Appeals cases, including *Steillman v. State*,

---

[12] At oral argument, the Defendant argued *Hill* was distinguishable because it is a "First Amendment case." The Defendant's point is unclear. If, pursuant to clearly established law, the Plaintiff's speech was protected by the First Amendment, that law is clearly relevant to whether the Defendant had arguable probable cause to arrest the Plaintiff.

295 Ga. App. 778, 673 S.E.2d 286 (2009), to clearly establish that the Plaintiff could have been arrested for his language. This argument stumbles upon the argument made by the dissent in *Poulakis*. These Georgia Court of Appeals opinions are not relevant to determine clearly established law.[13] However, the dissent in *Poulakis* would hold this authority is relevant to determine arguable probable cause because that determination is a part of the constitutional violation prong of the qualified immunity analysis.

However, the Court need not struggle with that question because the facts of *Steillman* are clearly distinguishable from the facts here. In *Steillman*, the defendant was riding a child's bicycle through a parking lot when an officer asked, "What's going on?" 295 Ga. App. at 779, 673 S.E.2d at 287. The defendant replied, "Not a d*** thing." *Id*. When the officer told him to watch his language, the defendant said, "I don't have to. What the f*** are you going to do about it?" *Id*. The defendant pedaled away and yelled obscenities. When backup arrived, the officers stopped the defendant, but he refused to let go of the bicycle and continued to shout obscenities and threats. Finally, after three more officers arrived, they were able to handcuff the defendant and arrest him. Here, the Plaintiff was never asked to watch his language, he had turned to walk away before uttering his epithet, he was not shouting to be heard by bystanders, he was not challenging the Defendant, and he certainly made no threats. Thus, *Steillman* and the cases discussed in *Steillman* offer no support for the argument that the Plaintiff's profanity, in the context that it was used here, provides arguable probable cause to arrest for misdemeanor obstruction or disorderly conduct.

---

[13] Clearly established precedent in this Circuit only applies to opinions of the United States Supreme Court, the Eleventh Circuit, and the highest court of the pertinent state. *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007). *Steillman* was decided after these events, so it could not have been clearly established precedent in any event.

Next, the Defendant cites *Gold v. City of Miami*, 121 F.3d 1442 (11th Cir. 1997). In *Gold*, the plaintiff, while looking for a parking space in a congested parking lot, saw a woman who did not appear to be handicapped walk to her car in a handicapped space and drive off.  The plaintiff, frustrated, yelled at a uniformed officer for not giving the woman a ticket for parking in a handicapped space.  After the plaintiff found a parking space, he walked toward an ATM and "loudly remarked to no one in particular, 'Miami police don't do s***.'"  *Gold*, 121 F.3d at 1444.  The remark was heard by a plainclothes officer at the ATM who said to the uniformed officer, "'I think this guy has got a problem.'"  *Id*.  The plaintiff responded, "'I don't have a problem.  I'm just saying that Miami police don't do s***.'"  *Id*.  Another plainclothes officer standing next to the uniformed officer asked the plaintiff for his identification.  After meeting at the uniform officer's patrol car, the three officers decided to arrest the plaintiff for disorderly conduct.

The district court denied both the plaintiff's and the officers' motions for summary judgment.  The Eleventh Circuit reversed, and held that even though there was no actual probable cause to arrest the plaintiff, there was arguable probable cause because given "the words used, the tone used, the decibels used, and the reaction of onlookers … a reasonable officer in the same circumstances and possessing the same knowledge as the officers in this case could have reasonably believed that probable cause existed to arrest [the plaintiff] for disorderly conduct."  *Gold*, 121 F.3d at 1446.

Arguably, *Gold* has long been confined to its peculiar facts.  Judge Barkett, in her dissent from the Eleventh Circuit's denial of rehearing *en banc* in *Gold*, argued that the panel opinion "wholly ignores the First Amendment's protection of speech critical of the police, failing even to mention the United States Supreme Court's governing precedent

in this area." *Gold v. City of Miami*, 138 F.3d 886, 888 (11th Cir. 1998) (Barkett, J., dissenting).  The governing precedent to which Judge Barkett was referring is *Hill*.  Further, Judge Barkett noted the panel decision "also conflicts with the decisions of every other Circuit to address a police officer's entitlement to qualified immunity for arresting an individual for using abusive language."[14]  *Gold*, 138 F.3d at 892.  Since the panel decision in *Gold*, the Eleventh Circuit has acknowledged the limitations that *Hill* places on officers to arrest citizens for perceived verbal misconduct.  For example, in *Skop*, the Eleventh Circuit, although dealing with somewhat different facts, said that "the idea that Skop's brief inquiry to the officer somehow provided a basis for arrest collides head-on with the First Amendment, which 'protects a significant amount verbal criticism and challenge directed at police officers…. The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.'"  485 F.3d at 1139 (quoting *Hill*, 482 U.S. at 461-63).  *See also Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005) (quoting *Hill*'s "police state" language).

In any event, this case is clearly distinguishable from *Gold*.  The phrase in *Gold* initially was yelled in a congested parking lot and directed at no one in particular, and

---

[14] Circuits that have interpreted *Hill* have held that similar phrases directed at law enforcement officers were not "fighting words."  *Stearns v. Clarkston*, 615 F.3d 1278, 1282-84 (10th Cir. 2010) ("you're probably the mother***er that shot my dad"); *Johnson v. Campbell*, 332 F.3d 199, 211-15 (3d Cir. 2003) ("son of a b****"); *Greene v. Barber*, 310 F.3d 889, 894-98 (6th Cir. 2002) ("you're really being an a**hole"); *Resek v. City of Huntington Beach*, 41 Fed. Appx. 57 (9th Cir. 2002) ("That's f***ed up, those pigs can't do that without a search warrant"); *Provost v. City of Newburgh*, 262 F.3d 146, 156-60 (2d Cir. 2001) (even if the plaintiff said "I don't have time for this bulls***" or "I can't sit around on my fat a** all day like you," the speech was protected); *U.S. v. Poocha*, 259 F.3d 1077, 1079-82 (9th Cir. 2001) ("f*** you" or "that's f***ed"); *U.S. v. McKinney*, 9 Fed. Appx. 887 (10th Cir. 2001) (telling military police officer to "go f*** himself"); *Buffkins v. City of Omaha*, 922 F.2d 465, 472 (8th Cir. 1990) (plaintiff said "a**hole system" or "I will have a nice day, a**hole").

then was repeated when the plainclothes officer, who overheard the comment, challenged the plaintiff.  Here, unlike *Gold*, the parking lot was effectively empty.  Once the Plaintiff realized he was not going to change the Defendant's mind, he uttered the words – seemingly under his breath – as he was walking away.  The Defendant was the only one to hear the phrase.

At oral argument, the Defendant's counsel suggested that calling someone a "f***ing asshole," regardless of context, constitutes fighting words.  In support of this argument, the Defendant cites the fighting words subsection of Georgia's disorderly conduct statute.  O.C.G.A. § 16-11-39(a)(3).  This argument fails for two reasons.

First, as Judge Barkett noted, *Hill* recognizes that the "fighting words doctrine has a narrower application where . . . an individual's speech offends a police officer."  *Gold*, 138 F.3d at 888-89 (citing *Hill*, 482 U.S. at 462).  The Eleventh Circuit, like the *Hill* majority, has recognized that law enforcement officers, "'by virtue of [their] profession or training could be expected to absorb a certain amount of abuse without retaliating physically….'"  *Lamar v. Banks,* 684 F.2d 714, 718 n.13 (11th Cir. 1982).

Second, the obvious intent of the Georgia General Assembly when it enacted O.C.G.A. § 16-11-39(a)(3) was to incorporate the "fighting words doctrine" of the First Amendment.[15]  Consistent with this, the Georgia Supreme Court has held that a "face to face confrontation [is] necessary to trigger the exception allowing regulation of 'fighting words'…."  *Cunningham v. State*, 260 Ga. 827, 831, 400 S.E.2d 916, 920 (1991).  For example, in *Turner v. State*, 274 Ga. App. 731, 618 S.E.2d 607 (2005), the defendant

---

[15] Indeed, the Supreme Court struck down a previous version of Georgia's disorderly conduct statute because it was not expressly limited to "fighting words."  *Gooding v. Wilson*, 405 U.S. 518 (1972).

was convicted pursuant to Georgia's disorderly conduct statute for yelling "you bastards" as he drove by an officer who had pulled over another vehicle.  The Georgia Court of Appeals made clear that whether offensive language constitutes fighting words depends on "not only the words used but also 'the circumstances and context in which they were said.'"  *Turner*, 274 Ga. App. at 732, 618 S.E.2d at 608 (quoting *Lundgren v. State*, 238 Ga. App. 425, 427, 518 S.E.2d 908, 910 (1999)).  Citing *Cunningham*, the court reversed the defendant's conviction because the defendant was not engaged in a face-to-face confrontation with the officer.

In short, context and circumstances do matter.  Here, it is undisputed that the Plaintiff uttered the epithet as he was walking away – thus ending any face-to-face confrontation – and that the Defendant, a law enforcement officer, was the only one to hear the phrase.  Based on these facts, the Defendant had no arguable probable cause to arrest the Plaintiff for misdemeanor obstruction or disorderly conduct.[16]

### 2.  Could the Plaintiff Be Arrested for His Actions?

The Defendant alternatively claims he could have arrested the Plaintiff for misdemeanor obstruction because the Plaintiff failed to stop walking when he was told to do so.  As mentioned above, there was no arguable probable cause to arrest the Plaintiff for saying "f***ing asshole."  There also is no evidence on the audio/video recording that the Plaintiff pointed at the Defendant or said "f*** you" as he walked away.  In any event, the Defendant testified that the decision to arrest the Plaintiff already had been made once he got out of the patrol car.  Because a reasonable law

---

[16] The Defendant also argues the very act of asking to give his daughter a break constitutes obstruction.  However, the Court cannot say that a parent knowingly and willfully obstructs a law enforcement officer when he asks that officer to exhibit leniency toward his child.

enforcement officer would have had "fair warning" that he could not arrest someone for saying "f***ing asshole" as the speaker walked away, a reasonable law enforcement officer also would have had "fair warning" that he could not arrest that individual for continuing to walk away.

The Defendant finally argues the Plaintiff was obstructing by resisting arrest.  It is doubtful that being stiff constitutes resistance.  In any event, by unlawfully arresting the Plaintiff, the Defendant was not carrying out his lawful duties, and thus there was no arguable probable cause to arrest the Plaintiff for misdemeanor obstruction by "resisting" arrest.  Indeed, it has long been the law in Georgia that plaintiffs have the right to resist an unlawful arrest.  *See Mullis v. State*, 196 Ga. 569, 579, 27 S.E.2d 91, 98 (1943) ("Where an arrest is not lawful, the person sought to be so arrested, contrary to his right if the arrest had been lawful, has the right to resist, and in doing so has a right to resist force with force proportionate to that being used in unlawfully detaining him.").

Accordingly, because there was no arguable probable cause to arrest the Plaintiff, the Defendant is not entitled to qualified immunity.  Thus, the Motion must be denied on the Plaintiff's Fourth Amendment claim.

### C.  First Amendment Claim

"To state a [First Amendment] retaliation claim, the commonly accepted formulation requires that a plaintiff must establish first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech."  *Bennett*, 423 F.3d at 1250.  In

*Bennett*, the Eleventh Circuit adopted the objective test for the second prong: "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* (internal quotations and citation omitted). With regard to the causal connection prong, "the plaintiff must show that the defendant was subjectively motivated to take the adverse action because of the protected speech." *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011). "[O]nce the plaintiff shows that her protected conduct was a motivating factor, the burden shifts to the defendant to show that she would have taken the same action in the absence of the protected conduct, in which case the defendant cannot be held liable." *Id.*

As discussed, it is now undisputed that the Defendant arrested the Plaintiff for his speech. That speech was protected by the First Amendment. An arrest would deter a person of ordinary firmness from exercising his First Amendment rights. There is no evidence the Defendant would have taken the same action in the absence of the Plaintiff's protected conduct.

Accordingly, the Defendant is not entitled to qualified immunity on the Plaintiff's First Amendment claim, and the Motion is denied.

### D. Eighth Amendment Claim

The Plaintiff's excessive force claim is premised on force used during an unlawful arrest. "[W]here an excessive force claim is predicated solely on allegations the arresting officer lacked the power to make an arrest, the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim." *Bashir v. Rockdale County, Ga*, 445 F.3d 1323, 1332 (11th Cir. 2006). However, "the damages

recoverable on an unlawful arrest claim 'include damages suffered because of the use of force in effecting the arrest.'" *Id.* (quoting *Williamson v. Mills*, 65 F.3d 155, 158-59 (11th Cir. 1995)).

Here, the Plaintiff's claim for excessive force is limited to him being handcuffed and the Defendant untimely loosening the handcuffs after the Plaintiff complained they were too tight. To the extent the Plaintiff asserts an excessive force claim based upon the Defendant lacking the power to make an arrest, it is subsumed within his unlawful arrest claim, which may proceed to trial.

To the extent the Plaintiff purports to raise a discrete excessive force claim for being handcuffed,[17] the Plaintiff has not created a genuine issue of material fact as to the existence of excessive force. "Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal." *Rodriguez v. Farrell*, 280 F.3d 1341, 1352 (11th Cir. 2002). Here, the Plaintiff has presented no evidence that his carpal tunnel syndrome was caused by his handcuffing on December 24, 2008. Conversely, the Defendant has presented expert testimony that the Plaintiff's condition was caused by his "long-standing insulin dependent diabetes mellitus," and not handcuffing. (Doc. 24-12, at 6). Thus, the Plaintiff has failed to establish a constitutional violation on a discrete excessive force claim, and the Defendant is entitled to qualified immunity.

Accordingly, the Motion is granted on the Plaintiff's Eighth Amendment claim.

---

[17] The Plaintiff did not include being placed in a choke hold or pinned against the trunk of a car in his Eighth Amendment claim. However, the fact that the Plaintiff was placed in a choke hold and pinned against a trunk still can be a part of the damages on his unlawful arrest claim.

### III.     CONCLUSION

For the foregoing reasons, the Motion is **DENIED in part and GRANTED in part**.

A trial will be held on the issue of damages.

SO ORDERED, this the 7th day of May, 2012.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT